Benjamin B. Odell, Jr., as Sole Qualifying Receiver of Thomas McNally Company, Appellant, Respondent, *v.* The City of New York, Respondent, Appellant.

First Department, July 6, 1923.

**Municipal corporations — city of New York — action by receiver of foreign corporation to recover balance on contract for construction of division of Catskill aqueduct and for work and labor furnished that was not within contract — foreign corporation was not doing business in this State when contract was made and could sue thereon, although it had not procured certificate of authority under General Corporation Law, § 15 — verdict of jury on questions submitted was supported by evidence — direction of verdict as to certain claims was proper.**

In an action against the city of New York to recover for an alleged balance due on a contract for the construction of a division of the Catskill aqueduct and for work and labor performed and materials furnished in excess of the amount required by the contract, it appeared that the corporation of which the plaintiff is receiver was a foreign corporation which had not done any business in this State prior to the signing of the contract and that it secured its certificate of authority under section 15 of the General Corporation Law to do business within this State after the construction work was commenced.

*Held,* that said foreign corporation had the right to sue on the contract to recover any balance claimed to be due;

That the verdict of the jury on questions of fact submitted as to certain claims presented was amply supported by the evidence; and that the direction of a verdict as to certain other claims was proper under the evidence submitted.

CROSS-APPEALS by the plaintiff, Benjamin B. Odell, Jr., as receiver, etc., and by the defendant, the City of New York, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 10th day of March, 1919, upon the verdict of a jury rendered in part by direction of the court.

*Strasbourger & Schallek* [*Nathan L. Miller* of counsel; *Samuel Strasbourger* and *Max L. Schallek* with him on the brief], for the plaintiff.

*George P. Nicholson, Corporation Counsel* [*Elliot S. Benedict* of counsel; *John F. O'Brien* with him on the brief], for the defendant.

DOWLING, J.:

These are cross-appeals taken from a judgment entered on the verdict of a jury in favor of plaintiff in the total amount of $89,381.76. The defendant appeals from any judgment whatever being recoverable against it, whether by direction of the court or by verdict of the jury. The plaintiff appeals from the dismissal by the court of certain of his claims, as well as from the verdict of the jury in favor of the defendant on certain of the claims submitted to them.

The examination of the voluminous record in this case, involving as it does many claims urged by plaintiff, some of them highly technical in their nature, satisfies us that the results reached by the trial court and the jury were correct and should be affirmed. The minutes of the trial, which lasted nearly a month, and necessitated the inquiry into claims aggregating nearly $1,500,000, are ample demonstration of the intelligence, impartiality and thorough grasp of the controversy by the learned trial judge, who submitted the questions of fact remaining in the case to the jury in a charge so informing, clear and precise that the latter found no difficulty in resolving the issues with justice and discrimination.

Nothing but the earnestness with which the learned counsel for the parties press their objections to the judgment would require any discussion of the questions presented on the appeal, and it will be impossible to do more than to briefly refer to them, to keep within any reasonable limits of an opinion.

In the early part of 1907 Thomas McNally was president of the Thomas McNally Company, a Pennsylvania corporation, with an office in Pittsburgh. On the 18th day of March, 1907, the company put in a successful bid to do the work described in contract No. 2, Peekskill division of the Catskill aqueduct, between

First Department, July, 1923.                    [Vol. 206

Hunters brook and Foundry brook valleys. The contract, including information for bidders, specifications, etc., covers nearly 150 printed pages of the case on appeal.

Attached to the contract as plaintiff's Exhibit 4 are certain contract drawings known as accession or Acc: drawings. These cover twenty-three pages.

The contract was executed by the contractor on April 10, 1907, and by the board of water supply, acting for the city of New York, on April 18, 1907, while the comptroller's certificate, under section 149 of the Revised Greater New York Charter, was affixed April 24, 1907.

The McNally Company started actual construction work about July 1, 1907, particularly in relation to excavating a tunnel for the aqueduct through some hills, known as the Garrison tunnel.

Thereafter, by order of the Supreme Court of Westchester county, dated March 3, 1909, William E. Paine and Benjamin B. Odell, Jr., were appointed receivers of the property of the Thomas McNally Company in the State of New York and were authorized to complete the contract of that company with the city of New York, known as contract No. 2, Peekskill division, Catskill aqueduct. The two receivers acted together until the spring of 1913 when Mr. Paine resigned, leaving Mr. Odell to complete the contract, which he did.

The method of completing the contract pursued by the receivers, as outlined by the plaintiff in respect to the Garrison tunnel section, was to employ superintendents, the first of these on certain sections being Gore, Meenan & Co. This concern became financially embarrassed and quit the work after several months, whereupon proposals were advertised and Hicks, Johnson & Co. succeeded on the sections previously handled by the Gore, Meenan people and others. Hicks, Johnson & Co. also failed in June, 1912, and the receivers completed the work themselves, employing individual superintendents; the first of these was one Johnson of the defunct Hicks, Johnson & Co., and later one Baldwin. On other sections John J. Hart was a subcontracting superintendent after the McNally Company failed. . R. K. Everett & Co. was another subcontracting superintendent on certain sections, working from the spring of 1909 until the fall of 1911 and this concern was succeeded by the Spring Hill Construction Company which worked until January, 1913.

The final certificate of the chief engineer of the board of water supply, in respect to the completion of the work and the amount due therefor, was dated September 26, 1914, and the work was accepted (with certain minor reservations) on October 27, 1914.

It is stated in the final certificate that the total amount earned under the contract was $3,988,342.28 and that there remained due thereunder the sum of $276,015.79. The final payment voucher showed certain interest deductions and payments ordered.

The amended complaint sets forth two causes of action. They were described by the court below in the charge to the jury as follows: " The plaintiff has divided his claim against the City into two causes of action. In the first cause of action he sues for what he contends is due him under the provision of the contract. In the second cause of action he sues on the theory that the City unjustly required the plaintiff and his predecessors to furnish materials and do work not covered by its contract and thereby committed breaches of the contract for which damages measured by the value of such materials and work he now seeks to recover."

In paragraphs 13 and 14 of the complaint, relating to the first cause of action, it is stated that prior to the completion of the contract the plaintiff had performed certain work, labor and services for which the defendant agreed to pay the sum of $4,223,574.09; that the defendant paid the plaintiff the sum of $3,725,826.49, and that there is owing to the plaintiff the sum of $497,747.60; that the chief engineer of the board of water supply certified that under the terms of the contract the plaintiff was entitled to the sum of $3,988,342.28 intead of $4,223,574.09. In paragraph 15 of the complaint it is alleged that the chief engineer erroneously and arbitrarily certified the value of the work at the amount set forth in said final certificate instead of at the larger amount above mentioned. In the 16th paragraph of the complaint it is alleged that the chief engineer, in making the final estimate, " arbitrarily and erroneously placed a construction upon said contract by which he refused to allow the plaintiff payment for work actually done or for which plaintiff was entitled to payment." The damages demanded under this cause of action amount to $497,747.60.

In respect to the second cause of action various items of damage are set forth and paragraph 19 of the complaint contains the following allegations in respect thereto: " That the defendant, acting by the said Board of Water Supply and its engineers, during the progress of said work, arbitrarily, unreasonably and in violation of plaintiff's rights under said contract, ordered and directed plaintiff to do and perform certain work which it claimed and asserted it was entitled to have said plaintiff perform under the terms of said contract, but which this plaintiff was not required to perform under the terms thereof; and that plaintiff protested against such orders and directions and performed said work at a largely increased cost and suffered damage thereby in the manner

hereinafter set forth." There are sixteen items of damage set forth under this cause of action aggregating $993,226.61.

Preliminarily, the defendant's first claim on this appeal is that the McNally Company, a foreign corporation, had not, when it entered into the contract with the board of water supply, complied with the provisions of section 15 of the General Corporation Law requiring it to obtain a certificate from the Secretary of State to the effect that it had complied with all the requirements of law to authorize it to do business in this State, and that because of its failure to comply with said section of the General Corporation Law it is debarred from bringing this action.

It appears that the contract was signed by the McNally Company April 10, 1907, and by the board of water supply on April 18, 1907. On May 18, 1907, Thomas McNally swore to a statement and designation under section 16 of the General Corporation Law, setting forth the business the company proposed to do in the State of New York, the location of its office, and the name of the agent upon whom service of process might be made. These papers were not filed in the office of the Secretary of State until September 9, 1907, and the certificate authorizing the McNally Company to do business in this State was issued September 9, 1907. It appears, however, that the McNally Company never did business in this State before the signing of the contract; it had no bank account, and did not maintain any office, in this State.

In *Penn Collieries Co.* v. *McKeever* (183 N. Y. 98) plaintiff, a West Virginia corporation, sued for the price of a cargo of coal which it had sold and delivered to defendant in the city of New York. The defense was that as plaintiff was doing business in this State, without having procured the certificate required by section 15 of the General Corporation Law, it could not maintain any action upon its contract. The Court of Appeals said (p. 102): " But no such narrow policy was intended to be declared by the statute as the prohibition of all corporate transactions by foreign corporations, irrespective of their nature, or of the condition under which they occurred; nor does the language indicate it. To bring into operation the statutory provision, the facts should show more than a solitary, if not accidental, transaction as was the one before us. They should establish that the corporation was conducting a continuous business. To be ' doing business in this State ' implies corporate continuity of conduct in that respect; such as might be evidenced by the investment of capital here, with the maintenance of an office for the transaction of its business, and those incidental circumstances which attest the corporate intent to avail itself of the privilege to carry on a business."

The McNally Company was not doing business in this State when the contract in question was made and, therefore, had the right to sue thereon.

Discussing now the items in dispute *seriatim*, regardless of who is the appellant in the particular case, we reach firstly those embraced in the first cause of action: (1) Items 3 and 4, for excavating and refilling over the aqueduct structure in shallow and deep cuts, in addition to the amount allowed by the engineer's estimate, $60,370.96. The court directed a verdict for $12,510.94. Both sides appeal from this directed verdict. Plaintiff claims that there should be a directed verdict for $47,860.02 additional; whereas the city contends the claims should have been dismissed.

These claims require reference to Exhibits 27 and 28. Plaintiff claims to be entitled to payment for refill of area between contour of surface of ground and the prescribed lines for payment for excavation, and that there should be taken into consideration in forming the area to be measured for refill the following lines: (1) The prescribed lines for refill; (2) the original surface or contour of the ground; (3) the outside neat line of the structure, and (4) prescribed lines for payment for excavation. The city claims the following lines should control: (1) The outside lines of the structure; (2) part of the prescribed lines for payment for excavation; (3) part of the prescribed line for refill or finished surface; (4) part of the line of actual excavation and refill. The contract provides: " Measurement and payment for refilling and embanking. Sect. 69. In general terms, the quality [quantity] of refilling and embanking to be paid for will be the quantity in the finished refill of [or] embankment below the designated lines and above the original surface of the ground or the prescribed excavation lines, whether or not the excavation may have been taken out to the prescribed lines. * * * Specifically, the quantity of refill and embankment (items 11 to 20), of whatever material shall be measured for payment as the volume, with the deductions hereinafter specified, included between the surface defined by the lines prescribed for the embankment or refill and the surface defined by one or all, as the case may be, of the following lines: The contour of the ground, the outside neat lines of the structure or structures, if any be included within the refill or embankment, and the prescribed lines for the payment for excavation wherever material has been previously removed by the contractor. The deductions to be made from the volume measured, as just described, shall be the space occupied by all quantities paid for under other items, except that no deduction shall be made for the space occupied by drains or pipes with a cross-section area smaller than 10 square feet. * * *

The aqueduct embankments will, for the most part, have the dimensions and slopes before described and shown on the contract drawings, Nos. 3224 and 3225; but the engineer may direct that a steeper slope be given to the aqueduct embankments in some places, and the measurement shall then be made to such designated lines. No measurement shall be made under items 11 to 20 of any material placed outside of the prescribed lines for embankments and refills, even though material to be wasted may have been placed with the permission, or at the direction of the engineer, immediately adjacent to or continuous with prescribed embankments and refills as being the suitable place for the disposal of such materials."

It is conceded that the trial court adopted the quantities as figured by the board of water supply engineers within areas shown on the exhibits. In so doing it strictly followed the contract, taking the following lines: (1) The prescribed lines for refill; (2) the outside neat line of the structure, and (3) the prescribed lines for payment for excavation. These lines are constant. It will be noted that in the contract the top measurement line is "the surface defined by the lines prescribed for the embankment or refill," and not the ground surface previous to excavation, which is what is being claimed by plaintiff as illustrated by the blue area on Exhibit 27; thus, between the refill surface line and the ground surface previous to excavation, there is an "air space" which clearly cannot be included in the area for which plaintiff is entitled to compensation for refill, even theoretically. As a measurement line, "the contour of the ground" applies only in embankments, and then it would seem to merge with the embankment line. The city's measurement lines are also clearly erroneous; they make no attempt to follow the contract provisions. This award should be affirmed.

(2) Claim 5.

Plaintiff appeals from the dismissal of his claim for $4,520.01 for excavation. This is a measurement claim and does not include work actually performed and not paid for. At certain places, to obtain a firmer foundation for the aqueduct, the contractor was ordered to go down further either to solid rock or such depth as would secure a firmer foundation; he was then ordered to thicken the invert of the aqueduct so that it would extend to the bottom, thus excavated, within the limits prescribed. In making the measurements claimed by plaintiff the engineers constructed a horizontal line one foot out from the excavation of the bottom of the invert constructed as directed by the city's engineer and the outside surface of the aqueduct. Plaintiff claims he was entitled

to do this under section 53 of the specifications which provides: "Wherever wholly in earth, the excavation from the aqueduct trench shall be measured to the bottom shape actually excavated within the limits prescribed, as of a width 2 feet greater (1 foot on each side) than the actual width of the masonry to be constructed therein, measured horizontally from the intersection of the prescribed outside surfaces of the bottom and side of the masonry, and as if excavated with side slopes from this bottom of one horizontal to one vertical."

The city claims this extra excavation is covered by section 55 of the contract, which reads as follows: "Measurement of miscellaneous excavation.— Sect. 55. Excavations for structures other than the aqueduct proper, including those for culverts and pipes, shall be measured for payment to the subgrade specified for such excavations and to vertical lines one foot outside of the neat lines of the bottom of the structure to be built therein; but payment shall be made for those parts only of such excavations which are outside of the prescribed limits for the regular aqueduct trench, as above specified. Materials excavated for highways or rights of way, and for miscellaneous purposes, for which measurement is not otherwise specified, shall be measured in place, to the limits established by the engineer for each case."

Section 42 also is relevant. "Wherever the material at the established subgrade is found too soft or otherwise unsatisfactory for supporting the aqueduct, it shall be excavated to such additional depth and within such limits as may be ordered. Spaces thus excavated shall be filled with concrete, or with gravel or earth carefully selected and thoroughly compacted, to be paid for under appropriate items."

This claim is best understood by looking at defendant's Exhibit A. The city paid for the actual additional excavation directed, and the concrete used. This claim for theoretical excavation and refill was without any basis and was properly dismissed.

(3) Claim 6.

The city appeals from a directed verdict for $8,001.70 for excavation and refill in widened open cut in rock and earth trench in excess of the engineer's estimate. This was contested on the trial on the theory that the city's engineer had no power to enlarge the area to be excavated so as to hold the city liable to pay an additional amount because of the enlargement, but the city now admits, following the decision in *Kerbaugh, Inc.,* v. *City of New York* (177 App. Div. 907; affd., 228 N. Y. 576), that the engineer had such power. It shifts its contest to a construction of the "prescribed neat lines" referred to in section 54, which provides: "Measure-

ment of aqueduct trenches in rock and earth.— Sect. 54. Whenever the lower portion or the whole of the aqueduct trench is in rock, the excavation shall be measured as of a bottom width 20 inches greater (10 inches on each side) than the distance between the bottoms of the prescribed neat lines for the sides of the rock excavation, and as if having side slopes of 6 vertical to 1 horizontal.''

The city concedes that the prescribed neat line of excavation is fixed by the contract at a distance of twelve inches from the inside of the aqueduct wall at the bottom, but contends that the excavation payment line is variable and may be fixed by the engineer whenever it becomes necessary to vary the shape of the excavation. This is in violation of the plain language of the contract. The neat line is based on the line established by the engineers, being the line of excavation beyond which no rock shall project, and when the engineer changed the dimensions of the size of the trench, the prescribed neat line was such new actual excavation line, and payment must be based thereon and measured thereby. This award should be affirmed.

(4) Claim 7.

Plaintiff appeals from a dismissal of his claim for $10,106.64 for excavating 8,767 cubic yards for drainage trenches. At stations 613.50 and 620 a high hill stood at one side of the aqueduct site. Plaintiff dug out from the side of the hill a great quantity of sand which he used in making concrete. The hill was city property and he was not required to pay for the sand. As a result of such digging, a level space was developed. The city engineer directed the construction of drainage trenches here. Plaintiff claims that he is entitled to compensation for excavating (which was originally done for his own benefit) from the original contour of the side of the hill down to the surface as it was when the order for the drainage trenches was given. This claim was without weight and was properly dismissed.

(5) Claim 16.

Plaintiff appeals from a dismissal of his claim for $14,410.36 for drainage trenches excavated within the lines fixed for payment for excavation for aqueduct trench. It appears that after the plaintiff had practically finished his work, excavated the aqueduct trench and refilled same, the city compelled the plaintiff to excavate drainage trenches between the actual line of excavation for the aqueduct and the line of payment for trench excavation. This, too, after plaintiff had been paid for trench excavation. This work was done under protest. The city claims that as plaintiff was paid once for excavating the area within which these drainage trenches were laid out, he is not entitled to payment of this claim.

Further it relies on section 55 of the contract, which has already been quoted.

Under section 47, " one price only is to be paid under each item, to cover the excavation of all materials, except top soil."

This is an attempt to be twice paid for work in connection with the same area, and excavation can be paid for only once, whether actually done or only included within measurement lines. (See art. XXX, §§ 41, 47, 52 of specifications.) This claim was properly dismissed.

(6) Claim 21.

The defendant appeals from the $1,786.32 verdict of the jury on this claim for regrading the highway at the north end of the Garrison tunnel. In June, 1914, at the direction of the city's engineer, plaintiff graded and surfaced a highway parallel to the aqueduct north of the Garrison tunnel, to stakes given by the engineers. It excavated 1,543 cubic yards and did some surfacing at the contract price of $1,756.82. The city refused to pay this amount on the ground that the road, when originally built and graded by McNally in 1907, was graded too high, thereby necessitating the excavation for which plaintiff now seeks to be compensated. McNally testified that he built the road to the grade given by the engineers, which grade differed from the grade shown on the drawings. The city denied absolutely that McNally obeyed the direction of the engineers. This presented a clear question of fact, which the court, in an adequate charge, submitted to the jury. There was sufficient proof to support the verdict. The city's contention that it is not bound by the errors of its engineers is without weight. This award should be affirmed.

(7) Claim 24.

Plaintiff appeals from the dismissal of his claim for $11,419.45 for excavating material used in building up a drainage system. Originally, where the aqueduct was built on the side of a hill, it was planned to build culverts to drain the hillside. These culverts were to go under the aqueduct. Subsequently the city, as it had the right to do, changed the plan for draining the hillside, and directed plaintiff to fill in the space between the top of the embankment and the side of the hill with earth so that the water would drain over the embankment instead of under it. Plaintiff claims compensation for excavating the material to fill in. This claim is barred by the following sections of the specification:

" Sect. 50. * * * Materials [excavated] which cannot be placed at once in permanent positions shall be deposited in storage piles, at locations designated. Materials re-excavated from such storage piles, however, shall not again be paid for as excavation. The

surplus shall be neatly disposed of in grading and filling or in spoil banks, in such places and within such limits as directed."

" Work included in payment for refilling and embanking.— Sect. 70. The prices stipulated under Items 11 to 20 shall include the placing of the materials, spreading in layers wherever required, rolling, and ramming, sprinkling, trimming embankments, excavation from borrow pits, facing stone embankments, and all labor and materials incidental thereto, not specifically included for payment under other items."

The dismissal of this claim was correct.

(8) Claim 26.

The defendant appeals from a directed verdict for $2,808.04 for excavating and depositing material to " landscape " the right of way through the Healy property. The city engineers directed plaintiff to make the slope of the right of way uniform. This necessitated in some places excavating of knolls or hillocks and in other places filling in. The excavating amounted to 1,237 cubic yards at $1.32, total $1,632.84, and the refilling of 4,520 cubic yards at twenty-six cents, total $1,175.20. The city contends that this is covered by item 57, under which the city paid plaintiff $5,500, and which provides:

" Item 57. For all work necessary to put the grounds, the aqueduct and the appurtenant structures covered by this contract in a neat and satisfactory condition, at the completion of the contract, the lump sum of five thousand five hundred dollars ($5,500.00)."

But Engineer Ridgeway of the board of water supply testified that this was more than ordinary " cleaning up," and that the landscape work was done with the object of pleasing or appeasing Healy, who had a claim against the city. The defendant contends that this claim is similar to the claim of the contractor in *Borough Construction Co.* v. *City of New York* (200 N. Y. 149), where the Court of Appeals refused to allow the contractor pay for furnishing elevators to lower automobiles into the sewer, and to illuminate the same, in connection with the inspection thereof by city officials. But the work directed in the case at bar was within the contemplation of the contract, was done on the city's property, by the direction of the city engineer and for the benefit of the city. The direction of the verdict was proper.

We now come to the second cause of action.

(9) Claim 10. Item 1.

The city appeals from the jury's verdict of $15,000 on this item, which was submitted to the jury on the following charge:

" This is a claim for an alleged change of plan in that the con-

tractor was directed to build invert with grooves or steps instead of the type which has been referred to at the trial as invert with pockets. The plaintiff claims that after the contractor had built 4,500 linear feet of invert with pockets every 15 feet, as indicated in Accession Drawing 3224, Hart, one of the superintendents, was told in August or September, 1909, by the engineers that they wanted water stops or grooves inserted in each side of the aqueduct; that the witness protested but obeyed the orders of the engineer. It is also claimed that the City changed the plan of invert from pocket type to step type at another section. The City contends in the first place that it did not compel the contractors to use the groove type or step type, but that the contractors had their option to use the pocket type if they preferred it, and the City further contends that in any event there can be no recovery as no damages have been sustained in that it was cheaper to build the invert of the groove and step type than it was to use the pocket type.

" Of course the measure of damages is the difference between the reasonable value of doing the work under the contract and the reasonable value of doing the work in the changed form, if any, and the plaintiff claims under that measure of damages he is entitled to $48,972.88, and as I said before, the defendant first claims that he was not compelled to use the groove and in the second place that he suffered no damage as it was cheaper to build the groove system than it was the other system. So much for that claim."

A real question of fact was presented. But the city contends that the testimony as to the cost of the additional work is not satisfactory; that the testimony is not as to actual cost, but as to estimated cost, the estimates being made by plaintiff's superintendents.

In *Uvalde Asphalt Paving Co.* v. *City of New York* (196 App. Div. 740) Mr. Justice GREENBAUM said: " The proper rule of damages, in a case where the contractor has complied with the improper demands of the owner under protest, and completed his contract, * * * is that damages are to be based upon a *quantum meruit* of the increased cost incurred in consequence of unwarranted interferences."

As to this claim, evidence was given as to the number of men employed, the time occupied and the other details required to justify the testimony of the witnesses as to the reasonable cost of the work done. They gave testimony as to what it would cost to construct the invert with pockets, as called for by the plan, and estimated the cost with grooves as directed by the

engineers. The verdict is supported by this testimony and should be affirmed.

(10) Claim 11. Item 2.

The defendant appeals from the verdict of $1,200 for rock and earth excavation in widening the trench south of station 761. This claim involved the increased cost of excavating 800 yards of earth and 1,200 cubic yards of rock. The charge of the learned trial court was as follows:

"Claim No. 11. This is a claim for widening the trench at the north end of Mekeel tunnel in rock section. Plaintiff claims that Baldwin said he was told to build a compact earth type of aqueduct at these points and that he built the trench for such a type and that it was approved; that subsequently he was ordered to build a rock type and widen his trench, that in doing so he excavated 800 feet of earth at $1 a cubic yard and 1200 yards of rock at $3.40 and expended $40 for moving a track; that these claims would amount to $4968. He admits that the City has paid him $2,640 and he claims that there is still due him the sum of $2328. The defendant says he never ordered the contractor to build the compact type, that the condition of the rock on the side was loose and shattered and that it had to be removed and that they had a right to do this under Sections 42 and 44 of the specifications and Article 14 of the contract, all of which I have read to you in connection with another item."

This claim involves only a question of fact, as to which the finding of the jury is supported by the testimony. The city again raises a question as to the sufficiency of plaintiff's proof as to the amount of rock and earth removed, but plaintiff's witnesses McLaughlin and Baldwin measured with a rod and plumb line the air spaces after the removal of the material. Any criticism of this method, instead of keeping a record of the number of cars of material removed, was only a question as to the weight to be given to the testimony. The verdict should be affirmed.

(11) Claim 12. Item 3.

The defendant appeals from the verdict of $10,000, upon a claim based on the amount due for increased cost incurred in deepening trench in rock down to solid rock caused by change of plans, including damages for delay to the contractor's work caused by such change of plans. The amount of plaintiff's claim was $42,402. The contractor claimed that the character of the bottom of the excavation on which the aqueduct was to rest was indicated on Acc. drawing 3224 showing a typical cross section of the aqueduct " in rock " with concrete resting on points of rock between which are shown pockets to be filled as stated upon

the drawing, with " hard packed rock debris." It further claimed that it had finished the work of excavating and had removed its machinery, and was preparing to begin its concrete work, when the engineers decided they wanted a bottom, not of hard packed rock debris, but of solid rock, and then compelled the plaintiff to clean out the pockets and bar and wedge all rock which they did not consider firm. The trial court eliminated the question of misrepresentation, and submitted the matter to the jury on the following charge:

" Now we will take up Claim 12, second cause of action. This is known as the rock pocket item. It is contended by the plaintiff that the contract drawing 3224 shows the method of building aqueduct in rock cuts and that the contractor is obliged to excavate to the A line and to the established sub-grade and that beyond this no rock is to be or to extend, as the contractor in blasting would never be able to get an even bottom. It is claimed that he is permitted to fill in the pockets in the bottom with 'hard packed rock debris,' and that he proceeded to work in two sections in rock cut, one north of the Mekeel tunnel and another south of the Garrison tunnel. In both places he claims he excavated to the depth required by the engineers and had his bottom ready for invert laying; that after having finished this work without objection from the engineers he removed his heavy excavating plant; that thereafter he was required to clean out the rock debris, which, in accordance with the contract, had been left in the pockets and that in doing this he was obliged to bar and wedge out, in the absence of his heavy machinery, all loose and seamy rock, which was work done at a largely increased cost and which work delayed his entire operation to his damage in the sum of $27,611.39.

" The defendant denies any liability for this item of damage and claims that it acted clearly within its rights under the contract in ordering the contractors to clean out these pockets and fill them up with concrete upon paying for the extra concrete according to the terms provided in the contract. In this connection I call your attention specifically to Sections 43 and 44 of the specifications and Article XIV of the contract, existing between the City and the contractors."

The learned trial court then read the sections and article in question and proceeded to say:

" I charge you as a matter of law that under this provision the City had a right, provided its engineers did not act in an arbitrary manner, to order these pockets cleaned if they thought it unfit to lay the invert on, and provided it did not unduly delay

6

the same and provided further that it paid for the removal of the rock from the pockets at the contract prices and also for the concrete which was placed therein. The City had a right to a reasonable opportunity for inspection during the progress of the work and it is for you to say whether the engineers acted in an arbitrary manner in ordering these pockets to be cleaned out or not, or whether there was unnecessary delay on the part of the City in connection therewith. If you find that there was not, your verdict will be in favor of the defendant. If, on the other hand, you find that the City engineers acted in an arbitrary and unreasonable manner and that they unduly delayed the inspection until after the contractors had removed their heavy plant, then you may find in favor of the plaintiff for such sum as you find he has been damaged by reason of such arbitrary and unreasonable action in delaying inspection, not exceeding the sum of $27,611.39."

The defendant again raises the question as to the sufficiency of the evidence to support the verdict as to the damage sustained. The number of cubic yards of work done was conceded. Plaintiff's witnesses testified as to the reasonable value per cubic yard, and as to the value of the time lost. The figures given by plaintiff's witnesses are far in excess of the limit named by the trial judge in his charge, and the testimony is ample to support a verdict for a great deal more than was found. There is no question raised that the result reached is a compromise verdict, and it should be affirmed.

(12) Claim 13. Item 7.

The defendant appeals from a verdict of $5,419.57 on this item.

Plaintiff claims that the contract and plans called for carrying the aqueduct across Ferris Brook Gorge on an embankment. He was ready to go ahead with this work in May, 1909, when he received orders from the engineers to hold up work on it as there had been a change of plan by which a concrete viaduct was to be substituted for the earth embankment. He protested, but thereafter built the viaduct. The trial judge charged: "As to this item of damage, I hold as a matter of law that there was a change of plan and the plaintiff is entitled to recover the cost of the structure and viaduct upon which the aqueduct was laid, on a *quantum meruit*, that is, the value of the work done and not at the figures set forth in the contract. From this sum, of course, must be deducted the amount actually received from the city for said work. The plaintiff contends that the cost of the structure was $15,511.30 [$15,511.20]. The city paid $10,511.20 [$10,091.63], and that, therefore, the plaintiff claims that he is entitled to receive $5,419.63 [$5,419.57]. The defendant, on the other hand, contends that the reasonable cost

was only $10,449.27 and that in any event the plaintiff would only be entitled to recover the sum of $354.34."

This claim involved a question of fact as to the difference in the cost of construction and the result reached should not be disturbed, but the verdict should be affirmed.

(13) Claim 15. Item 4.

Plaintiff appeals from a dismissal of his claim for $4,072.78 for cleaning of Garrison tunnel and the open cut to the south. It appears that under the contract the contractor after completing the aqueduct in the Garrison tunnel was obliged to clean out all the debris and leave the aqueduct in a perfectly clean condition. On the contract drawings there are shown three culverts which were to be built south of the portal of the Garrison tunnel. In estimating the cost of cleaning the tunnel, the contractor took into consideration that, by using these culverts and leaving an opening over them in the invert, he could sweep out his debris, muck, water, etc., from the tunnel through these culverts at a very small expense. In 1913 these culverts were eliminated by the engineers against the protest of the contractor, and as a result of such elimination of the culverts the work of cleaning had to be done in a more difficult way than that contemplated by the contractor when bidding on the drawings. This claim is for the additional cost to which the contractor was put.

.The answer to this is that the purpose of the culverts was to drain off the land on the high side of the aqueduct to the low side, and were in no way designed for the purpose of cleaning out the aqueduct or to help the contractor in his work therein. There is no proof that defendant had knowledge of the contemplated use of the culverts by the plaintiff at the time the contract was entered into. The claim was properly dismissed.

(14) Claim 17. Item 9.

Plaintiff appeals from a dismissal of its claim for $12,086.04 as damages for the excess costs of constructing drainage trenches, due to a change of plan on the part of the engineers, and for neglect to provide in time a plan for such trenches until after the contractor had removed all his machinery and apparatus from the place at which the work of building the aqueduct had been done.

This claim arises out of the facts involved in claim 16, in the first cause of action.

The city resists allowance of this claim because it never was presented to the engineer of the board of water supply. The contract provides:

" Contractor's claim for damages — Art. XI.— If the contractor shall claim compensation for any damage sustained by reason

of the acts of the board or its agents, he shall, within five days after the sustaining of such damage make a written statement of the nature of the damage sustained, to the Engineer.

" Statements of damage to be filed with Engineer.— On or before the fifteenth day of the month succeeding that in which any such damage shall have been sustained, the Contractor shall file with the Engineer an itemized statement of the details and amount of such damage, and, unless such statement shall be made as thus required, his claim for compensation may be forfeited and invalidated, and he shall not be entitled to payment on account of any such damage."

As the city contends, the object of the above provision is that the engineer may investigate the claim when the facts are fresh in the minds of every one to see if they tally with the claim as made to minimize the cause of damage, if possible. Under a similar clause in a public contract this court has held that the city is not liable where the contractor fails to present his claim. (*Degnon Contracting Co.* v. *City of New York,* 202 App. Div. 390, 395.) The dismissal should be affirmed.

(15) Claim 22. Item 10.

The defendant appeals from the verdict of $10,000 on a claim for damages sustained by the contractor through the wrongful condemnation of inside steel forms for moulding the arch of the aqueduct. The inside steel forms in question were made of steel plates five feet square, having at the end of each side an angle iron by which it was bolted to the adjacent plate, and by bolting these plates together the continuous section of aqueduct arch, as long as seventy-five feet, could be constructed at one time. It appears that the angle iron, being one-sixteenth to one-eighth inch thicker than the adjacent plate, left a depression in the masonry in the interior of the arch. This defect caused Division Engineer Sproul to condemn the form. Plaintiff claims his plant was idle for over five months of one working season waiting for new forms to arrive. The following year another division engineer permitted the contractor to use the condemned forms, providing the small depressions were filled in with cement. The trial court submitted the question to the jury on the following charge:

" Claim No. 22. This is known as the claim of damages for condemnation of the concrete forms used on Mr. Hart's section. The claim is on the theory that because of the arbitrary and unreasonable action of the engineers in condemning the forms in question, the plaintiff has sustained damages to the extent of $25,125 on the theory that he was delayed five months by the taking down of the condemned forms and the erection of new ones. He contends that

the action of the engineers was arbitrary and unreasonable and in substantiation of that contention claims that the same forms were subsequently used by the City with the consent of the engineers, in another section of the work conducted by Mr. Johnson.

" The City had the right to condemn the forms if they were not suitable for the purposes for which they were being used and it is claimed by the defendant that the action of its engineers was not arbitrary but was justified by the condition of the forms which were in use when condemned. The defendant further contends that the same forms were not subsequently used in another place in the same manner in which they were used when condemned but claims that these forms were used after they had been repaired so that there would not be a collapsing of the same, thereby causing a wavy and uneven surface in the aqueduct. It is for you to say whether or not in this instance the engineers acted in an arbitrary and unreasonable manner. If you find that they did not, your verdict must be for the defendant. That is, you understand the contention of the City is that these forms in the condition in which they were when condemned were not suitable for the purposes for which they were being used, and that subsequently when they were permitted to use them, they had been repaired and it is contended by them that it was not until after Mr. Johnson had spent from one to three thousand dollars on them in repairing them that they were permitted to be used. Of course, the plaintiff denies that that had anything to do with it. The plaintiff contends that this was the ordinary bracing that would be done in any event, so that is the issue. If you find that they did not, your verdict must be for the defendant, but if you find that they did, your verdict will be in favor of the plaintiff as to this item and you may award him such damages as will compensate him for the damages he has sustained by reason thereof, not exceeding the sum of $25,125."

The good faith of the engineer originally condemning the forms presented a question of fact, and the verdict should be affirmed.

(16) Claim 33.   Item 14.

The defendant appeals from a verdict of the jury for $5,532.18, the cost of additional stone crushed and furnished by plaintiff. It appears that from 1909 to the spring of 1912 plaintiff was engaged in excavating the tunnel. In 1911 he brought stone from the tunnel and crushed it, and deposited it in the trench just south of the tunnel, to be used in constructing the aqueduct. For all stone deposited by him at the job he was to be paid fifty cents per cubic yard. He claims that in 1911 his superintendent asked the city engineer to survey the stone piles and determine if sufficient stone was crushed for use south of the tunnel. In the spring of 1912 he

was told, he claims, by Engineer Gould, that he had enough stone crushed for use for the open cut south of the Garrison tunnel, but plaintiff crushed 3,000 cubic yards more. In April, 1913, plaintiff's superintendent, Baldwin, was told by Engineer Bunker that he had enough stone to build the aqueduct to the south. Plaintiff claims that thereafter the engineers ordered the sidewalls and inverts of the structure deepened and widened in many places, so that in August, 1913, it was discovered that insufficient stone had been crushed. Plaintiff was compelled to bring up a new crusher (the old one being abandoned and useless), to get his rock from piles, to carry it to the crusher and to crush 3,827 cubic yards at an expense of $6,680.28, instead of $1,148.10 which it would have cost if done at the proper time. The verdict is for the difference between these figures. This claim was submitted to the jury as follows:

" We will now take up Claim No. 33. This is the crushing stone claim. The amount claimed is $5,532.18. It is claimed that in 1911 Mr. Johnson, who was working in the Garrison tunnel, asked an engineer to make a survey of crushed stone; that in 1912, Mr. Gould, one of the engineers, came to his office and told him that he had sufficient stone crushed for the open cut south of Garrison tunnel, but that notwithstanding that fact he crushed over 3,000 yards more, using his own judgment as to the amount.

" Mr. Gould, the engineer, absolutely denies that he ordered the contractor to stop crushing stone and it is claimed by the city that the contractor was required under the contract to have sufficient stone for his work and that if he had more than was necessary he would not be paid under the terms of the contract for such excess stone. Here we have a direct issue between these two men. It is significant to note, however, that notwithstanding the fact that Mr. Johnson claims he was ordered to stop crushing stone, as a matter of fact he did not, but crushed 3,827 cubic yards more, depending upon his own judgment. If you believe that the engineer told him to stop crushing stone and as a matter of fact he did stop because of that direction, plaintiff would be entitled to recover for the damages sustained, not exceeding $5,532.18. But, if on the other hand, you find that he did not give such order, your verdict must be in favor of the defendant."

The contract provides:

" Monthly · Estimates. Art. XXXI. In order to assist the contractor to prosecute the work advantageously, the engineer shall, from time to time, as the work progresses, but not oftener than once a month, on or about the last day of the month, make in writing an estimate, such as in his opinion shall be just and fair, of the amount and value of the work done and materials furnished

by the contractor in the performance of this contract. He shall further include accepted materials delivered on the site of the work, but not incorporated in the work as follows: * * *

" Crushed stone or gravel for masonry, at the rate of fifty cents per cubic yard. * * *

" But the quantity of any one of these materials included in any partial estimate shall not exceed the quantity of such material, as determined by the engineer, required to complete this contract * * *. Such estimates shall not be required to be made by strict measurement, but they may be made by measurement or by estimation, or partly by one method and partly by the other, and it shall be sufficient if they are approximate only."

Plaintiff, according to the foregoing provisions, would be bound by the engineer's estimates of the amount of stone required. It would seem, too, that plaintiff did not rely entirely on the judgment of the engineers, as evidenced by his crushing some 3,000 cubic yards of additional stone. But there was a question of fact as to whether the engineer directed him to stop crushing, and there is testimony to support the finding that he was so told. This finding should be affirmed.

(17) Claim 34. Item 15.

Plaintiff appeals from a verdict in favor of the defendant on a claim for $3,562.67 for alleged damages sustained by reason of the fact that wrong grades had been given to the contractor when excavating in rock between stations 258 and 272. It is claimed by plaintiff that Burstler, the city's engineer, gave wrong grades; but the city claims that it made no difference whether the wrong grade was given, if the contractor had not acted thereon to the extent of excavating in accordance therewith. The charge of the trial court is as follows: " Claim 34 is for work done between Stations 278 [258] and 272; the plaintiff claims that he excavated down to grade given by the engineers and that afterwards it was discovered that the grade was two feet higher than the proper grade and that when the mistake was discovered he was told to dig out this extra two feet. Under this item the plaintiff claims the sum of $3562.67. The defendant claims that it was not liable under this item, that as a matter of fact it did not give a wrong grade and that so far as damage was concerned, there can be no claim here because for months after it was definitely ascertained that the grade was too high, nothing was done by the contractor to get the right grade and that as a matter of fact he did not take out two feet until the following fall and therefore there can be no recovery here as a matter of right or by reason of delay."

Upon the facts shown, plaintiff was not damaged, and this claim

should have been dismissed. The verdict of the jury thereon in favor of defendant should be affirmed.

(18) Claim 35. Item 16.

Plaintiff appeals from a dismissal of his claim for $466,196.25 for damages alleged to have been sustained by reason of the alleged misrepresentation of the city in the plans upon which the contractor made his bid.

The contract specifications and drawing show nine standard types of construction for tunnels on the hydraulic grade along the Catskill aqueduct, developed to provide for all varieties of material from massive hard rock to saturated flowing earth. In the course of the work it was shown that earth, rock and water would be encountered. As to rock and earth the information to bidders annexed to the contract gave approximate amounts which would have to be excavated, and bids were based on so much per cubic yard of excavation of rock or earth. As to the water to be encountered and to be removed or provided for, no " approximate " or other figures were given, but the contractor was given the length of tunnel drainage and his bid was required to be a sum per linear foot instead of a bid based on quantity removed or taken care of. The specifications provided for the manner of doing the work. The contractor had to provide suitable pumping plants and build pumps or cisterns to take care of all water. He was required to put in temporary drains, for the bottom of the invert of the aqueduct could not be built until the bottom of the tunnel was free from water and sufficiently dry, and permanent underdrains were to be built as required so that the invert might be placed on firm drained ground. Suitable devices were to be employed to protect all masonry until set against dripping or running water.

In the drawings are found eight types, letters A to H; which are the standard types of grade tunnels. All these drawings, plaintiff claims, are drawn to scale and a scale is contained on each sheet. A table showing the amount of excavating, of concrete, of timber and of dry packing required per linear foot is set out. At the bottom of each type, underneath the invert and resting on the bottom of the excavation is shown a square or round drain. These are the drains to be laid so that the " bottom of the tunnel may be free from water and sufficiently dry at all times " as provided in specification section 163. These drains, according to the scale to which the drawings are made, range from six by six-inch boxes to eight by eight-inch boxes and six to eight-inch pipes where the excavation is in rock, to boxes as big as ten by twelve inches and fifteen-inch pipe where the excavation is in saturated earth. The drains shown to be used in rock, which was found practically through

the entire Garrison tunnel, had a capacity of seventy to eighty gallons a minute, but, as a matter of uncontradicted fact, the quantity of water encountered in excavating the tunnel in rock was as high as five hundred and sixty gallons per minute. As a result of this excessive water the cost of drainage excavation and construction, plaintiff claims, was enormously increased. The reasonable value of the drainage was $118,393.30, instead of $25,004.20, the cost had the water contemplated been encountered, a difference of $93,389.10. The excess cost of excavating rock was $257,183.52. The excess cost of building side walls of the tunnel was $47,495 and of building the invert $6,557.50, or a total excess cost or value of the work of $404,625.12. For this amount plaintiff sought to recover.

The plaintiff claims that it has been damaged in this amount and that the city is liable therefor, because the plans were representations or warranties which bind the city and render it liable for the additional cost caused by mistakes therein; that the contract, plans and specifications make a representation as to existing physical conditions; that the drains shown in the drawings were a representation to the contractor that if he laid such a pipe or box it would carry off all of the water he might encounter, and leave the ground firm and drained for laying his concrete invert and thus constituted a direct representation of the physical fact that no more water would be encountered than could be carried off in these drains. These drains as shown on the drawing meant something very definite to the contractor, he claims, and they should have meant the same to the engineers who drew the plans; that is, that assuming that he would have to put in the largest drain shown, such drain would carry off the largest amount of water which he might encounter.

The drawings which contained the alleged misrepresentation appear at pages 1638–1640. A careful examination of these drawings shows that practically every detail gives dimensions, with the exception of the drains. Plaintiff contends that dimensions were not necessary, as the plans were drawn to scale. These drawings show the location of the permanent drains under the aqueduct, in the event that such drains were required. There is nothing to indicate that these drains are all that might be required temporarily during the course of construction.

The information for bidders stated that soundings, boring and test pits had been made along the line of the aqueduct and that the record of the holes and samples of materials taken therefrom could be seen at the office of the board of water supply at Peekskill, and that such borings were mostly made by wash drills, although some were made by core drills. It then continues: " Most of the

borings were made by means of wash drills, but many were made with core drills of various types. The test pits have been left open and may be inspected. There is, however, no expressed or implied guarantee as to the accuracy of the borings and soundings, nor of any interpretation of them. Each bidder must form his own opinion of the character of the materials to be excavated, from an inspection of the ground; put his own interpretation upon the soundings and borings made by the City, and make such other investigations as he may see fit."

Also contained in the information for bidders is the statement of approximate quantities of the various classes of work. Item 36 thereof relating to drainage states: "Tunnel Drainage — 14680 linear feet of tunnel." Then follows a statement that the bids are to be submitted on the following conditions:

"Bidders must satisfy themselves, by personal examination of the location of the proposed work, and by such other means as they may prefer, as to the actual conditions and requirements of the work and the accuracy of the foregoing estimates of the Engineer, and shall not, at any time after the submission of an estimate, dispute or complain of such statement or estimate of the Engineer, nor assert that there was any misunderstanding in regard to the nature or amount of the work to be done.  *  *  *

"Attention is called to the uncertainty as to the total quantities of materials to be excavated to prepare trenches for the aqueduct and especially to the quantities and kinds of materials to be excavated from the tunnels, since they will depend upon the character of the earth and rock which cannot be determined in advance. The quantity of masonry to be built is liable to vary from that estimated for the same reasons."

The contract further provides:

"Art. XXIII. The Contractor shall take all responsibility of the work, shall bear all losses resulting to him on account of the amount or character of the work, or because the nature of the land in or on which the work is done is different from what is assumed or was expected, or on account of the weather or other cause;  *  *  *.

"Art. XXX. The City will pay, and the Contractor shall receive, in full compensation for furnishing all the materials and labor, and for performing and completing all the work which is necessary or proper to be furnished or performed, in order to complete the entire work in this contract described and specified, and in said specifications and drawings described and shown, and also for all loss or damages arising out of the nature of the work aforesaid, or from the action of the elements, or from any unforeseen obstruction or difficulty encountered in the prosecution of the work, and

for all risks of any description connected with the work, and for all expense incurred by or in consequence of the suspension or discontinuance of the work as herein specified, the following prices, to wit:   *   *   *.

"For tunnel drainage, including drains of acceptable size and all materials and work incidental to the proper drainage of tunnels, the sum of One and thirty-five one-hundredths dollars ($1.35) per linear foot of tunnel."

Coming to the specifications annexed to the contract we find in section 17 under the heading "sufficient equipment for rapid construction," the following described equipment to be furnished by the contractor:

"Pumping plants of such liberal capacity as to readily remove all water that it may be necessary or advantageous to remove from the excavations or other parts of the work at any time and to furnish an abundant supply of water under suitable pressure for the various purposes of this contract."

Section 24 thereof is most important. It provides:

"Sect. 24. The Contractor shall provide all necessary pumps, pipes, drains and other means for removing water from the excavations or other parts of the work, or for maintaining the slopes of excavations from sliding or caving, and shall satisfactorily remove the water. He shall provide additional pumps or drains at any place the Engineer shall deem them to be necessary for the proper conduct of the work.

"Payment for Pumping and Draining. It is understood that payment for pumping and draining or otherwise removing water from the various parts of the works, as required, and all expenses incidental thereto, is included in the prices for the parts of the work in connection with which they are done, excepting as specifically provided under Item 36 for tunnel drainage."

"Section 33 of the specifications reads in part as follows:

"Sect. 33. For the plant, equipment, tools, and temporary works, required by this contract, except as otherwise specified, and for all materials and expenses incidental to the satisfactory construction, maintenance and removal of such works, the Contractor shall receive no direct payment, but it is understood that compensation for them is included in the prices to be paid for the various items of the contract for which they may be required."

In section 161 we find the following:

"Sect. 161. The Contractor shall make all necessary provisions for taking care of the water which may be encountered in the tunnel, both during excavation and during placing of masonry."

Sections 162, 163 and 166 are as follows:

" Sect. 162. The Contractor shall provide suitable pumping plants of ample capacity at the outset of the work, so that there may be no delay should water be encountered, and these plants shall be enlarged as may become necessary to handle the water effectively. Sumps shall be excavated at shafts and elsewhere, if necessary. The excavation for these sumps shall be made under this item, without further compensation, but concrete, if used for refilling, shall be paid for under Item 38.

" * * * Sect. 163. Before the invert masonry is placed, suitable drains shall be maintained in order that the bottom of the tunnel may be free from water and sufficiently dry at all times, and except at especially dry places where the Engineer may deem them unnecessary, permanent underdrains shall be laid, in order that the invert concrete may be placed on firm, drained ground. Suitable openings shall be left at places designated to allow the water from these underdrains to come up into the tunnel, so as not to bring a pressure upon the invert. Underdrains need not be straight nor on the center line of the tunnel, but shall not be so near footings of side walls as to endanger their stability."

" Sect. 166. The compensation for all plant, labor and materials in connection with the handling of water in tunnels shall be the price per linear foot of tunnel stipulated in Item 36, and the ultimate quantity to be paid for shall be the total linear feet of tunnels measured between the stations for portals shown on the contract drawings."

It thus appears that pay for all pumping and draining necessary to be done in connection with the construction of the aqueduct was to be included in the amounts paid for excavating, etc., and that for installing permanent underdrains of the types shown on the contract drawings (Acc. 3226, 3227 and 3228) and referred to in section 166, the contractor was to be paid in accordance with the provisions of article XXX, item 36, at one dollar and thirty-five cents per linear foot of underdrain laid.

As has been said, in the drawings the box or pipe which indicates a permanent drain under the aqueduct has no dimensions set forth as connected therewith, the only figures or words in the form of a legend directly connected with the box or pipe being the words " drain as required."

Yet practically every other dimension, whether as to the diameter of the tunnel or the thickness of the concrete in different places, is explicitly designated on the plans of the different types of tunnel.

Thus it will be seen that it was expected that water would be encountered, but no one attempted to approximate the quantity. In the information for bidders, prospective bidders were cautioned

to inspect the ground for themselves. There is no evidence in the record that this additional work was ordered by the city, or that the contractor did it under protest. When he found his original plant was inadequate, he installed additional pumps of his own accord and ran his drainage ditches in the manner he thought best.

Apparently the amount of water encountered was an element unforeseen by all parties, and while one may regret the additional burden placed on the contractor, that burden arises through no misrepresentation on the part of the city, and he must bear it alone as best he may.

Everything that could be done to put bidders on their guard as to the difficulties and dangers of the situation was done. They were advised of the nature of the ground of operations, as disclosed by the borings, but were warned that they must satisfy themselves thereof, either by examination of the location of the proposed work, or by such other means as they might choose to adopt. Their attention was called to the uncertainty as to the amount of materials to be excavated, as well as their kind.

The board of water supply carefully refrained from making any representations as to the nature of the medium in which the underground work was to be done, and certainly made no misrepresentation as to the same. The dismissal of this claim was proper and should be affirmed.

The judgment appealed from should be affirmed, with costs to defendant.

CLARKE, P. J., SMITH, MERRELL and FINCH, JJ., concur.

Judgment affirmed, with costs to the defendant.