HANLEY Co., INC., Plaintiff, *v.* WILLIAM L. BRADLEY and Others, Defendants.

Supreme Court, New York County, April 16, 1927.

*O'Brien, Boardman, Fox & Early* [*Harold L. Allen* of counsel], for the plaintiff.

*Baldwin, Hutchins & Todd* [*Hiram C. Todd* and *Donald B. Vail* of counsel], for the defendants Bradley and Lefferts.

*Charles Foster Brown,* for the defendants Keuls and Whittemore.

*Masten & Nichols,* for the defendant H. B. Improvement Corporation.

VALENTE, J. This is an action for rescission of an executed contract for the purchase and sale of all of the issued and outstanding stock of the Anglo-Dutch Trading Corporation. The essential facts are comparatively simple. Plaintiff Hanley Company, Inc., entered into a contract in writing with the defendants for the purchase from all of them of 560 shares of preferred stock and 1,650 shares of common stock, which was all of the issued and outstanding capital stock of the Anglo-Dutch Trading Corporation. The plaintiff agreed to and did pay the defendants for the stock the sum of $108,533.20. The evidence establishes, and I find as a fact, that the purchase of the stock was induced by and the price paid therefor was fixed and agreed in reliance by the plaintiff on the truth of the figures contained in the report of Scovell, Wellington & Co. (Plaintiff's Exhibit 2), certified public accountants, which report was attached to and made a part of the contract of purchase and sale. The accuracy and the truth of the statements contained in the report of the auditors was guaranteed by the defendants in the contract entered into between the parties. The auditors' report purported to reflect the actual condition of the Anglo-Dutch Trading Corporation as of December 31, 1925, and represented that the total net worth of that company on December 31, 1925, was $64,198.33. This sum was made up of two items as follows: (a) $8,000, representing good will; and (b) $56,198.33, the actual value of the assets over and above liabilities. The report of the auditors further represents that for the entire year 1925 the Anglo-Dutch Trading Corporation operated at a loss of $114. By this report the defendants represented to the plaintiff that the Anglo-Dutch Trading Corporation had operated during the year 1925 at a loss so inconsequential in amount as not seriously to affect the value of the business as a going concern. It was these representations, to wit, (a) that the company operated at a loss of $114 in 1925, together with the representation (b) that the net worth of the Anglo-Dutch Trading Corporation was $56,198.33, exclusive of good will, that induced the plaintiff to purchase the stock of the Anglo-Dutch Trading Corporation at the price bargained for and paid.

From the testimony adduced before me I find that the plaintiff has established by a fair preponderance of evidence the falsity of both of these representations, and that the representations were of such materiality as to warrant a rescission. The report of the auditors represented that on December 31, 1925, the Anglo-Dutch Trading Corporation had on hand 1,875,212 brick. The evidence establishes that the inventory was grossly overstated. An audit of the company's books by plaintiff's auditor disclosed that at the

beginning of 1925 the Anglo-Dutch Trading Corporation had on hand 864,400 brick. During the year 1925 the Anglo-Dutch Trading Corporation received an additional 4,489,050 brick, and sold or disposed of 4,003,998 brick. The total of the amount of brick that the Anglo-Dutch Trading Corporation received during the year and had on hand during the year 1925 was, therefore, 5,353,450 brick. Deducting from the gross amount the 4,003,998 brick sold and disposed of — as the books of the corporation disclose — the total that was on hand on December thirty-first was 1,349,452 brick, instead of 1,875,212 brick, as represented by the report of the auditors of the defendants, thus showing a shortage of the inventory of 525,760 brick. It appeared without contradiction that the brick was worth $20 per thousand; the value of 525,760 brick, viz., $10,515. I find that the audit attached to the contract in this respect was overstated by this sum. The defendant Keuls in his effort to account for this shortage, and to prove that there was no shortage, as testified to by the accountants for the plaintiff, stated that he had purchased 300,000 brick from the dock department of the city of New York and that his purchase was made from two persons whom he could not describe, whose names he did not know and whom he could not identify. The checks said to have been in payment for this particular lot of brick were drawn to the order of cash and either cashed by Keuls himself or by some one representing him. The company received no invoice and no receipt for the payment of this money. The plaintiff produced one Andrew S. Corbett, who testified that he was the only auditor of the dock department; that he had examined the books of account of the department for a transaction for the sale of Holland brick to the Anglo-Dutch Trading Corporation during the spring of 1925, and testified, " There is no such record." When asked whether the department of docks engages in the sale of brick, he replied, "Absolutely not." And when asked whether there was any record of payment for bricks to the department of docks, he replied, " There has been no such sale, consequently no such record." I do not credit the testimony of Keuls. I find as a fact that such brick was not purchased or received by the Anglo-Dutch Trading Corporation. Keuls further testified that in April, 1925, he had an actual count made of the brick on hand and that he discovered that the company had 183,000 brick more than his record disclosed. No satisfactory explanation of the surplus was made by the defendants. The testimony of Keuls in regard to this item and the 300,000 brick alleged to have been purchased from the dock department is so unsatisfactory the court can give it no credence whatever. Plaintiff's auditor, Towns, resorted to

another method to ascertain the actual amount of brick on hand as of December 31, 1925. He testified that he ascertained the actual number of brick on hand as of April 19, 1926, by count. By adding to the inventory as of that date all of the brick shipped after January 1, 1925, to the various customers of the Anglo-Dutch Trading Corporation and then subtracting the actual number of brick delivered to that company since January 1, 1925, there appeared a shortage of 836,236 brick. These figures are taken from the books of the corporation. At $20 per thousand the shortage by this method was $16,724.72. By either method pursued by the auditor of the plaintiff — that is, by actual count, plus additions and subtractions, shipments and receipts, and by an examination of the books and records of Anglo-Dutch Trading Corporation — the net worth was overstated by the report of Scovell Wellington as follows: (a) By the one method, $14,724.72; and (b) by the other method $10,515. The Scovell Wellington Company's report further represented that the company operated during the year 1925 at a net loss of $114. This figure was arrived at by improperly including in the report certain unearned or anticipated profits on future delivered contracts wholly or partially to be executed during 1926, and against which certain estimated expenses had been set up. In Exhibit C of the Scovell Wellington report the item of sales included $66,875, which represented the proceeds of sales of brick which had not been delivered at the time the entries were made. The entries were made in November, 1925, and represented 2,250,000 brick. One hundred and seventy-four thousand of this brick were delivered prior to December 31, 1925, leaving according to the testimony of plaintiff's auditor, $61,551, included in the item of sales as gross income December 31, 1925. There was applied against that future costs and trucking charges amounting to $7,286.50, and the difference between the two was incorporated into the statement as $14,264.50 profit, which had at that time not been earned, nor indeed had the full purchase price for the brick been paid the company. " Profits " may be defined as the arithmetical excess of price received over the total of all costs to the seller. Profit cannot accordingly be computed until the total of costs is determined, and it is undisputed that the profits estimated were greatly increased by certain unexpected contingencies which arose after the preparation of the statement. The uncontradicted testimony of the auditor Towns showed that $14,264.50 incorporated in the Scovell Wellington report as profit earned during 1925 was not only not earned during that year, but was not earned at all. The operating loss of the company for 1925 was understated, and the net worth of the

company accordingly overstated by the amount of the unearned profits, plus the inventory shortages. It is significant that no representative of Scovell Wellington & Company was called to justify the report. The accountants were not justified in treating these so-called anticipated profits as earned profits, to thereby reduce the operating loss and increase the net worth of the company. (*Hutchinson* v. *Curtiss*, 45 Misc. 484, 490.) The facts bring the case within the line of authorities which hold that a contract may be rescinded where it is consummated through unintentional misrepresentation of material facts. (*Bloomquist* v. *Farson*, 222 N. Y. 375; *Leary* v. *Geller*, 224 id. 56, 58; *Hammond* v. *Pennock*, 61 id. 145; *Carr* v. *National Bank & Loan Co. of Watertown*, 167 id. 375; *Schank* v. *Schuchman*, 212 id. 352.) In *Leary* v. *Geller* (*supra*) Mr. Justice CRANE, writing for the Court of Appeals, stated the familiar rule as follows: " Equity will, in a proper case, avoid and set aside a transaction induced or procured through material misrepresentations and false statements although the statements and representations were honestly made with no intent to deceive." With these principles, and the undoubted equities of the case in mind, the plaintiff is entitled to the relief sought, unless the various defenses interposed bar the remedy.

It is urged that the plaintiff is guilty of laches. I feel that this defense merits no serious consideration. The agreement in question was executed on March 16, 1926, and this action commenced in June, 1926. This of itself is a sufficient answer to the defense of laches.

It is further urged by the defendants that section 110 of the Stock Corporation Law is a bar to this action. As I understand the law, I feel no necessity for discussing the evidence tending to prove that the plaintiff is or is not doing business within the State of New York in contravention of the statute. No evidence was adduced before me tending to prove that this plaintiff had ever transacted any business within the State of New York prior to the contract involved in this litigation. The law is well settled that a single transaction does not constitute doing business. Whatever plaintiff did subsequent to the execution of this agreement is not germane to the issue before the court. If plaintiff was not doing business prior to or at the time that this contract in question was made, the statute does not prohibit the bringing of an action thereon. In *Penn Collieries Co.* v. *McKeever* (183 N. Y. 98, 102) Judge GRAY said: " The policy of our State, as manifested

in its laws, is not to impose any unconscionable restrictions upon the transactions of foreign corporations here." The Court of Appeals but recently in *International Fuel & Iron Corporation* v. *Donner Steel Co.* (242 N. Y. 224), settles, in my opinion, the question now before me. In speaking of the effect of section 110 of the Stock Corporation Law the court says (*supra*, 231): " Taken literally, no corporation doing business in this State shall maintain any action upon any contract unless it procured the certificate prior to the making of the contract. This may be read so as to eliminate altogether the importance of the time when the corporation was doing the business in the State. That is, if a contract be made before the certificate be obtained, but the corporation do no other business within the State until after the procuring of the certificate, this section, taken literally, would prevent any action on such a contract. Here would be the case of a corporation doing business in the State, and a contract made before procuring the certificate. But such is not the law. The corporation must be doing business in the State *at the time* of making the contract, or before procuring the certificate." This statement of the law is applicable to the circumstances of the case at bar. In other words, if the contract before the court was made at a time when the foreign corporation was not doing business within the meaning of the law, then, irrespective of its future activities, section 110 of the Stock Corporation Law is no bar to an action on the contract made before the corporation did business here. " Laws should be construed sensibly, and plain purposes should not be defeated by narrow interpretations." (POUND, J., *Matter of American Eagle Fire Ins. Co.* v. *New Jersey Ins. Co.*, 240 N. Y. 398, 409.) In arriving at this conclusion I am not unmindful of the disjunctive " or " in the last line of the quoted portion of Judge CRANE's opinion. I do not construe this to mean that, irrespective of the time of doing business within the meaning of the law, a contract cannot be enforced. I do not think that if a corporation does business subsequent to the making of a single contract the statute would prohibit an action on the initial transaction. The statute is not punitive, but regulatory. It does not seek because of subsequent violations to punish a foreign corporation for making a contract at a time when it is unnecessary to have made application for a license. The entire spirit and language of Judge CRANE's opinion preponderates against such a conclusion. I am further fortified in this view of the law by the opinion of Mr. Justice DOWLING in *Odell* v. *City of New York* (206 App. Div. 68, 73; affd., 238 N. Y. 623), which was cited and quoted with approval in the *International Fuel Case* (*supra*). In the *Odell* case, which

is not essentially dissimilar from the case at bar, Mr. Justice Dowling concludes, and this language was quoted with approval by the Court of Appeals (*supra*): " The McNally Company was not doing business in this State when the contract in question was made, and, therefore, had the right to sue thereon." Under these circumstances I am constrained to hold that it is unnecessary to decide whether plaintiff subsequently to March 16, 1926, was actually doing business within the State of New York without first having received permission to do so. There being no evidence in the record that plaintiff was doing business prior to March 16, 1926, I hold that section 110 of the Stock Corporation Law does not bar this action.

Moreover, for another reason this case cannot properly be classified as an action prohibited by section 110. This action is for rescission and must of necessity be in disaffirmance of the contract, and, in the literal sense, at least, cannot be said to be upon the contract. Plaintiff is not seeking to enforce the contract in question. It is seeking to disaffirm it and recover back the money paid to defendants pursuant thereto. (*Eclipse Silk Mfg. Co.* v. *Hiller*, 145 App. Div. 568.) Therefore, under either theory of law, section 110 of the Stock Corporation Law is no bar to this action.

It is further urged by the defendants Keuls and Whittemore, both as a defense and a counterclaim, that they were released by plaintiff from any liability, and Keuls seeks by counterclaim to reform a certain agreement dated May 13, 1926, so as to incorporate therein a general release to him. I find no evidence in the record before me from which the conclusion may be drawn that it was the intention of plaintiffs to release either of these defendants from any liability under the contract of March 16, 1926. The defendants are divided into two classes, Keuls and Whittemore being active participants in the management of the Anglo-Dutch Trading Corporation, and the remaining defendants being mere stockholders, and, so far as the record shows, not active in the business of the corporation, with the possible exception of Gillet Lefferts, who was its attorney. After plaintiff had purchased the stock from these defendants it caused contracts to be made employing Keuls and Whittemore to represent it. Both of these defendants also purchased stock in the Hanley corporation, Keuls with funds given to him as a bonus by the Hanley Company, and Whittemore with funds partly his own and partly given to him by the Hanley Company. When it became apparent, after inventory of the brick had actually been taken by the plaintiff, that there had been misrepresentations, a conference was had between the plaintiff and

the defendants Keuls and Whittemore at the office of Gillet Lefferts. It was at that conference that these two defendants claim plaintiff orally released them from liability. At this conference a new contract in writing was drawn between plaintiff and Keuls. Keuls surrendered all of his stock that he had purchased heretofore with the funds given to him by the plaintiff. A new oral contract of employment was entered into between plaintiff and Whittemore, and Whittemore likewise surrendered his stock, but received back from the plaintiff the sum which he had personally advanced towards the purchase of the stock, which was approximately half of the amount of the purchase price. New contracts of employment were made with both, materially cutting down the salary agreed to be given them by their first contracts of March 16, 1926, and the period of time of their employment was changed from five years to two and a half years. And both consented to a cancellation of the original contract of employment, Keuls in writing and Whittemore orally. It is contended by the defendants Whittemore and Keuls that when they agreed to cancel the contract of employment and accept employment for a shorter period of time and for less money, and when they agreed to turn back the stock which they had purchased — Keuls with funds given to him by the Hanley Company and Whittemore with half of the funds given to him by the Hanley Company — that an oral release was given to them as part consideration. This is not borne out by the facts. The first amended answer drawn by the firm of which Gillet Lefferts was a member did not raise this question. It was only after the second amended answer was interposed and verified on February 1, 1927, on the very eve of the trial of this action, that this defense was first interposed. It seems that if there were any real merit to this defense it would have been raised by Lefferts' firm, inasmuch as Lefferts was present at the time of the signing of the new agreement with Keuls and the making of the new oral agreement with Whittemore. The evidence of officers of the plaintiff corporation shows beyond the peradventure of a doubt that it was not the intention of the plaintiff to release these two defendants of any liability under the contract of March sixteenth, and, indeed, when asked for a release, it was refused point blank. Papers were drawn on May thirteenth, and if releases were intended it would have been a simple matter to draft those. And as a matter of fact, in the new contract of employment entered into on May thirteenth between the Hanley Company and Keuls, there appears an actual release to Keuls and from Keuls to the Hanley Company, but only releases from any and all obligations in reference to the contract of employment entered into between the parties. Here

is an actual release, but for a certain purpose only. If general releases were to have been exchanged on that day they would have been general in form. I, therefore, find that the defendants were not released by the plaintiff from any liability under the contract of purchase and sale of March 16, 1926.

Lastly, it is urged by all of the defendants that rescission must be denied, because it is impossible for plaintiff to make adequate restitution so as to establish the *status quo ante*. Despite the reasons, which to me seem more numerous than meritorious, urged by learned counsel for the defendants, why restitution *in integrum* cannot be made, I am satisfied that equity in the exercise of its broad powers has ample means of effecting what has been called " equivalent restitution." Within a period of less than two months after the consummation of the contract, which, indeed, under the circumstances was a reasonable time, fraud at least in part was discovered. The plaintiff then offered to return the stock and place the defendants in *statu quo*. This offer was refused. Plaintiff thereafter promptly started this action. In the intervening period it was plaintiff's duty and obligation in mitigation of damages to preserve the property in order to do equity and to exercise reasonable diligence under the circumstances. This it did. Plaintiff could not have abandoned the business of the Anglo-Dutch Trading Corporation pending the trial of this action, but on the contrary, it was under a duty to carry on the business in the manner and fashion that it did. From the evidence before me I am convinced that whatever change took place in the business was negligible and would not be sufficient to bar this action. When plaintiff purchased the stock the business was operating at a great loss, and its net worth was far below what was represented by the Scovell Wellington report. Plaintiff did not purchase the corporation, but merely the shares of stock. What the defendants sold was the stock ownership and its incidental rights. This stock must be restored. In March, when plaintiff became owner of all of the stock of Anglo-Dutch Trading Corporation, it had on hand 2,501,711 brick. Plaintiff must, of course, restore this identical number of brick and is in a position to do so. Accounts receivable can readily be replaced in specie or cash. Plaintiff has offered to release the debt of the Anglo-Dutch Trading Corporation to it in the sum of $50,000 in order to restore proper book value. So far as the valuable services of the defendant Keuls as manager of the company is concerned, under the circumstances I do not consider his loss to the company as an obstacle in the way of rescission. A statement of the assets, liabilities and net worth was prepared by plaintiff's accountants (Plaintiff's Exhibit 12),

294

the substantial truth of which has been established by the evidence, and the accuracy of which was not challenged by the defendants. This statement shows the condition of the company on March 18, 1926, the day the plaintiff took over the shares of stock purchased by it and the management of the company.

In addition to the requirements set forth above, I direct that restitution be made so as to comply with and cause the Anglo-Dutch Trading Corporation to be in the same condition as reflected in plaintiff's Exhibit 12, and that a finding be made to that effect. As all of this may be done by replacement of cash for accounts receivable, etc., substantial restitution will thereby become effected. The findings of fact submitted by plaintiff are inadequate and in some instances improper in form. Let counsel submit findings and decision in accordance with this opinion, including appropriate findings of fact as to the material misrepresentations, and providing for the delivery of the release, the restoration of the brick, and the restoration to the *statu quo* which existed on March 18, 1926, as per plaintiff's Exhibit 12.